## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| NATIONWIDE AFFORDABLE HOUSING FUND 4, LLC, *et al.*, | |
| Plaintiffs, | Case No. 23-cv-04288 |
| v. | Judge Mary M. Rowland |
| URBAN 8 DANVILLE CORP., *et al.* | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Before the Court are cross motions for summary judgment by Plaintiffs, Nationwide Affordable Housing Fund 4, LLC ("Nationwide") and SCDC, LLC ("SCDC") (collectively, the "Former Limited Partners" or "Plaintiffs"), and Defendants Urban 8 Danville Corporation ("Urban Danville"), Urban 8 Macomb Corporation ("Urban Macomb"), Urban 8 Fox Lake Corporation ("Urban Fox Lake"), and Urban 8 Zion Corporation ("Urban Zion," and collectively, the "General Partners" or "Defendants"). For the reasons set forth below, the Court grants Defendants' motion for summary judgment [67, 69] and denies Plaintiffs' motion for summary judgment [62, 65].

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (*citing Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

When cross-motions for summary judgment are filed, the Court construes all facts and draws all reasonable inferences in favor of the party against whom the motion was filed. *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361 (7th Cir. 2017); *see also Chagoya v. City of Chicago*, 992 F.3d 607, 615 (7th Cir. 2021). The Court treats the motions separately. *Marcatante v. City of Chi.*,

2

433, 439 (7th Cir. 2011); *see also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416 (7th Cir. 2019) ("Each cross movant for summary judgment bears a respective burden to show no issue of material fact with respect to the claim.").

## BACKGROUND[1]

This case arises out of four Illinois limited partnerships formed in connection with the federal Low Income Housing Tax Credit program to develop affordable housing properties in Illinois. DRPSOF ¶ 4; *See* 26 U.S.C. § 42. Plaintiffs and Defendants were party to two prior disputes before this Court: *Urban 8 Danville Corp. et al. v. Nationwide Affordable Housing Fund 4, LLC et al.*, No. 1:19-cv-03171 (N.D. Ill.) and *Urban Fox Lake Corp. et al. v. Nationwide Affordable Housing Fund 4 LLC, et al.*, No. 18-cv-06109 (N.D. Ill.) (together, the "Prior Litigation"). DRPSOF ¶¶ 12-13. The Court assumes familiarity with the Prior Litigation.

Urban Danville Limited Partnership and Urban Macomb Limited Partnership own and operate affordable housing developments known as the Vermilion House Apartments ("Vermilion") and Jefferson House Apartments ("Jefferson," and together with Vermilion, the "Properties"). PRDSOF ¶¶ 5-6. Defendant Urban Danville is the general partner of the Urban Danville Limited Partnership, and Defendant Urban Macomb is the general partner of the Urban Macomb Limited Partnership. DRPSOF

---

[1] The facts in this Background section are undisputed unless otherwise noted. The Court takes these facts from Plaintiffs' Statement of Facts ("PSOF") [68], Defendants' Statement of Facts ("DSOF") [69-2], Plaintiffs' Response to DSOF ("PRDSOF") [75], Defendants' Response to PSOF ("DRPSOF") [79-1], Plaintiffs' Statement of Additional Facts ("PSOAF") [75], Defendants' Statement of Additional Facts ("DSOAF") [79-1], Defendants' Response to PSOAF [91], Plaintiffs' Response to DSOAF [87], and various exhibits and declarations the parties have submitted in connection with their cross-motions for summary judgment.

¶ 7. Andrew Delman is the President of the Defendants General Partners Urban Danville and Urban Macomb.[2] PRDSOF ¶ 4. Plaintiff Nationwide was formerly the investor limited partner in each of the Danville and Macomb Limited Partnerships, and Plaintiff SCDC was formerly the special limited partner in Danville and Macomb Limited Partnerships. DRPSOF ¶¶ 9-10. The Partnerships are governed by separate limited partnership agreements ("LPAs"). PRDSOF ¶ 3.

The Prior Litigation between the parties was resolved through a confidential settlement agreement ("Settlement Agreement") that is governed by Illinois law. DRPSOF ¶ 14. The Settlement Agreement provides for a Marketing and Sale Process, pursuant to which the parties agreed to engage Marcus & Millichap (M&M) to market Vermilion and Jefferson for potential sale to third parties. PRDSOF ¶ 6. Andrew Daitch and Seth Barnett worked as brokers for M&M and have extensive experience marketing affordable housing properties for sale. PRDSOF ¶ 7. M&M solicited offers from, among others, a combination of Stone Beam, Inc., DRE, Inc., and Cardinal Capital Management (collectively, "SB Group"). PRDSOF ¶ 14. Kent Frayn is a principal of Stone Beam, Inc. and Tim Welsh is a vice president at DRE, Inc. PRDSOF ¶ 15. Frayn was SB Group's exclusive point of contact with M&M. PRDSOF ¶ 16.

On or before December 20, 2022, SB Group submitted an initial offer for the Properties that did not individually allocate amounts to either Vermilion or Jefferson. PRDSOF ¶ 17. That day, Barnett emailed Frayn asking him to supply individualized pricing for the Properties. PRDSOF ¶ 17. Frayn replied with an allocation of $5.5

---

[2] Delman is also the President of Defendants Urban Fox Lake and Urban Zion. DSOF ¶ 4.

million for Jefferson and $7.6 million for Vermilion (the "First Allocation"). PRDSOF ¶ 18. The next day, M&M sent initial offers from 5 bidders, including the allocated offer from SB Group, to Delman. PRDSOF ¶ 13. The parties dispute whether or when this presentation was sent to Jeff Morgan, a secretary of Plaintiff SCDC and signatory to the Settlement Agreement. PRDSOF ¶ 13.

On January 17, 2023, Frayn, on behalf of SB Group, sent Barnett a best and final offer of $13.6 million without allocations to the individual properties. PRDSOF ¶ 21. The next day, Frayn emailed Welsh stating that ""[Barnett] is asking for individual pricing again." PRDSOF ¶ 23. The parties dispute the exact manner by which Welsh came to his allocation, but it is undisputed that Welsh ultimately gave Frayn an allocation of $4.8 million for Jefferson and $8.8 million for Vermilion (the "Final Allocation"). DRPSOF ¶¶ 48 – 59. Frayn never discussed the Final Allocation with either Barnett or Delman. PRDSOF ¶ 30. Neither Frayn nor Barnett had any idea how an allocation would impact either Plaintiffs or Defendants. PRDSOF ¶ 60. Daitch testified that either Morgan, Delman, or both may have requested that prospective buyers provide allocations, but he could not recall who it was. [67-33] at 89:12-90:12, 102:1-103:6.

Frayn provided the Final Allocation to Barnett on January 18, 2023 at 3:35 pm. PRDSOF ¶ 30. Nine minutes later, Daitch emailed Delman and Morgan a hyperlink to a presentation with three best and final offers (the "B&F Presentation"), including an unallocated $13.6 million offer from SB Group. PRDSOF ¶¶ 33, 36. Daitch's email indicated that the price allocation for SB Group's offer would be added

5

to the presentation the following day. PRDSOF ¶ 36. Before this point, there is no evidence that Delman knew about the Final Allocation. PRDSOF ¶ 34. By 7:13 am on January 19, 2023, the B&F presentation was updated to include SB Group's Final Allocation and was available to both Delman and Morgan via the hyperlink Daitch had sent the day prior. PRDSOF ¶ 37.

At 9:47am, Plaintiffs' counsel submitted to the Court the older version of the B&F Presentation that did not contain SB Group's Final Allocation. PRDSOF ¶ 38. At 11:00 am, Delman emailed Daitch (with Morgan copied) and asked him to provide the Final Allocation that Daitch had referenced the day before. PRDSOF ¶ 39. Daitch provided the updated version of the presentation containing the Final Allocation to both Delman and Morgan. PRDSOF ¶ 40.

Later that day, this Court held a hearing because the parties had not agreed on an offer for either property. PRDSOF ¶ 41. Daitch testified before the Court about the offers the parties had received. PRDSOF ¶ 43. The Court ultimately selected an offer from a buyer named Rhodium Capital, not SB Group. PRDSOF ¶ 45. As a result of the offer, Plaintiffs would receive $90,000 from the purchase of Jefferson and $409,909 from Vermilion, and both sides agreed not to appeal the Court's decision. PRDSOF ¶ 45.

Nonetheless, after the January 19 hearing, Plaintiffs suspected that something was amiss with the hearing and launched a months-long investigation which ultimately led to this lawsuit. *See* PRDSOF at ¶¶ 49 – 55. The investigation revealed, among other things, text messages that Delman sent Daitch during the January 19,

2023 hearing in which Delman told Daitch he "better do a good job," disparaged Plaintiffs' counsel, and told him he hoped he would "tell [this Court] what he really [thought]." DRPSOF ¶¶ 69-70.

Relevant to Counts II and III of Plaintiffs' amended complaint [39], the parties agreed pursuant to Paragraphs 37 of the Settlement Agreement that "no other contributions, distributions, allocations or payments of any kind or nature whatsoever are due from the [Defendants], or any of their affiliates, officers or shareholders, to the Partnerships… or any prior or current affiliate(s) thereof…" DRPSOF ¶ 75. Paragraph 38 of the Settlement Agreement similarly provides that "no other contributions, distributions, allocations or payments of any kind or nature whatsoever are due from the [Plaintiffs], or any of their affiliates, officers or shareholders, to the Partnership, General Partners … or any prior or current affiliate(s) thereof …". DRPSOF ¶ 75.

Section 6.8 of each relevant LPA between the parties required indemnification of Defendants "by the Partnerships against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by them (including reasonable attorneys' fees, fines, damages and similar payments) in connection with the Partnership[s]." PRDSOF ¶ 63.

It is undisputed that Defendants paid $685,941 of their own legal fees from the Prior Litigation and then sought and received indemnification from the Partnerships

for those fees. DRPSOF ¶ 76.[3] Plaintiff Nationwide[4] allege that this harmed them by increasing their tax liability. [39 ¶ 129]. But it is undisputed that (1) Nationwide is not a taxpayer and does not have any tax liabilities, (2) Nationwide passes all of their tax benefits and obligations, including any losses due to Nationwide's indemnification of Defendants' legal fees, to their investor member, Nationwide Life (who is not a party to this litigation), (3) as a part of their 2022 tax returns, Nationwide filed Form 8082s with the IRS stating that Nationwide was not including the disputed losses on their returns, and (4) even if Nationwide had not filed those Form 8082s, (in other words, if the indemnification expenses *were* included in Nationwide's 2022 tax returns), there would be no effect on Nationwide Life's net income.[5] PRDSOF ¶¶ 66 – 73.

## ANALYSIS

### I.    Interference with the Marketing and Sales Process (Count I)

In Count I, Plaintiffs allege Defendants breached the Settlement Agreement by materially interfering with the Marketing and Sales Process. Under Illinois law,[6] a breach of contract claim requires: (1) a valid and enforceable contract; (2)

---

[3] The parties do not dispute that Defendants were "indemnified" by the Partnerships for these expenses but dispute whether the expenses were "allocated" to the Partnerships. DRPSOF ¶ 76. Neither party explains what salience, if any, this distinction carries.

[4] There are no allegations related to Plaintiff SCDC in Counts II or III.

[5] Plaintiffs claim they dispute this fact. PRDSOF ¶ 73. But it is a fact that their own corporate representative testified to, and they do not offer any plausible explanation or alternative interpretation of what else their representative could have meant. This is not sufficient to create a genuine dispute for purposes of summary judgment. *Carter v. Am. Oil Co.*, 139 F.3d 1158, 1162 (7th Cir. 1998).

[6] The parties agree Illinois law applies in this case.

performance by the plaintiff; (3) a breach by defendant; (4) damages to the plaintiff resulting from the breach. *Illinois Neurospine Inst., P.C. v. Harding*, 2019 IL App (1st) 180161-U, ¶ 32 (1st Dist. 2019). When interpreting a contract, "[t]he court must attempt to give effect to the parties' intentions." *Gomez v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 130568, ¶ 13, (1st Dist. 2013) (citations omitted). The best indication of intent is the contract language's plain meaning. *Id.* "The burden of proving the necessary elements to contract formation is on the party seeking to enforce the agreement." *WCC Funding Ltd. v. GAN Int'l*, 871 F. Supp. 1017, 1025 (N.D. Ill. 1994).

Plaintiffs argue that Defendants materially interfered with the Marketing and Sales process by demanding a last-minute change to the highest "Best and Final" offer, a lump sum offer to purchase the Properties as a portfolio received from SB Group. More specifically, Plaintiffs focus on Andrew Delman, the sole owner of Defendants Urban Danville and Urban Macomb, contending he materially and intentionally interfered with the Marketing and Sales Process by (1) coercing SB Group, through M&M, to provide the Final Allocation; and (2) knowing Stone Beam internally decided upon an allegedly "tortured" allocation that was supposedly "arbitrary," "illegitimate," "forced," and "rushed." ¶¶ 68-71, 76-79, 87-102. The Court disagrees. The undisputed evidence demonstrates that neither of these contentions are correct.

First, the undisputed evidence shows that Defendants did not force SB Group to provide the Final Allocation. Plaintiffs assert that Barnett "was told by the seller – Defendants – that the transaction could not move forward without an allocation."

[74] at 7. But this is not supported by the record. Delman and Barnett did not speak with each other regarding the Marketing and Sales Process—both communicated with Daitch. [67-34] at 103:12-18; [68-3] at 73:10-17. Barnett testified that Daitch simply directed that "as part of the process for the [Partnerships], we need to get them more information, which includes purchase price allocations," but never told Barnett why. [78-1] at 96:6-97:4. Delman testified that he never represented anything to Daitch about rejecting unallocated offers, and otherwise never instructed or directed M&M to demand an allocation for any specific offer. [68-3] at 64:17-65:18, 96:10-97:10, 98:6-99:12, 100:14-23, 149:16-152:1); *see also id.* at 97:11-21 (testifying that he asked for allocations "at least once and then requested the delivery of them."). There is no evidence establishing that Delman used Daitch as an intermediary to demand an allocation through Barnett. It is not clear why Daitch wanted to obtain allocations, but he testified that he recalled being instructed to do so by *either Morgan, Delman, or both.* [67-33] at 89:12-90:12, 102:1-103:6. Plaintiffs argue, without evidence, that it could not have been Morgan and thus must have been Delman, [85] at 8. But this unsubstantiated assertion is rebutted by Delman's sworn testimony. *See Carter v. Am. Oil Co.*, 139 F.3d 1158, 1162 (7th Cir. 1998) (conclusory assertions in summary judgment briefing are insufficient to create a genuine dispute of material fact). Plaintiffs' contention that Defendants "induced [the Final Allocation] under false pretenses that the allocation was needed for . . . [the Court]" is likewise baseless and unsupported by the record. Thus, the undisputed evidence demonstrates Defendants did not force SB Group to create the Final Allocation.

Second, the record also demonstrates that Defendants had no knowledge of the alleged circumstances in which the Final Allocation was made. Plaintiffs admit that (1) Welsh never shared with M&M or Delman his underwriting or allocation methodology; (2) Welsh never spoke with M&M, let alone Delman, about his allocation decision; and (3) neither Welsh nor Frayn have ever spoken with Delman at all. DSOF ¶¶ 16, 24, 27-29. More succinctly said, it is undisputed that Welsh determined the Final Allocation fully on his own and Defendants knew nothing about its provenance. The parties hotly contest the way Welsh made his allocation decision, but no matter how it came to be, the record establishes that Defendants had no more knowledge of it than Plaintiffs. Plaintiffs highlight Welsh's request for additional time to develop a Final Offer allocation while driving his car and attempt to tie this to Defendants. But there is no evidence that Defendants ever refused an extension request or even knew that one was made. Frayn – not Defendants – reached out to ask about the Final Allocation. [67-36] at 19:23-20:21, 22:14-19. Further, Daitch made Delman and Morgan, Plaintiffs' representative, aware of the Final Allocation at the exact same time, and they were both included on all the same communications with M&M regarding the Final Allocation up until the January 19, 2022 court hearing. PRDSOF ¶¶ 35 – 40.

Thus, even if Defendants had caused SB Group to create the Final Allocation, it is not clear to the Court how or why this would constitute a breach of the Settlement Agreement. As Plaintiffs acknowledge, the Settlement Agreement allowed for allocated offers. [74] at 4. And Plaintiffs ultimately accepted an allocated offer from

Rhodium Capital (but only after arguing before this Court that they should receive SB Group's First Allocation, which was more favorable to them). Taking every reasonable inference in favor of Plaintiffs, and even ignoring *arguendo* Delman's own sworn testimony, the best case Plaintiffs can offer is that (1) Delman asked Daitch to get SB Group to allocate their best and final offer, (2) Frayn, at Daitch's direction, asked SB Group to provide an allocated offer, (3) SB Group provided the Final Allocation, (4) Daitch sent Delman and Plaintiffs' representative the Final Allocation at the same time, (5) the Court chose an allocated offer from an entirely separate buyer, (6) the parties agreed to that decision, and (7) Plaintiffs received just under $500,000 from the sale. Under these facts, no "reasonable trier of fact could find in favor" of Plaintiffs. *White*, 829 F.3d at 841.

Plaintiffs also focus on disparaging text messages that Delman sent while the parties were before this Court on January 19, 2022 as evidence of Delman's interference in the Marketing and Sales Process [66] at 8. While highly inappropriate and unprofessional, Plaintiffs do not explain how the text messages could plausibly support a claim for breach of contract.

Thus, the Court grants summary judgment on Count I in favor of Defendants.[7]

## II. Allocation of Attorneys' Fee and Tax Returns (Counts II and III)

In Count II, Plaintiffs allege Defendants breached the Settlement Agreement by allocating their own legal fees to the Partnerships and seek an order compelling

---

[7] Because the Court grants summary judgment on Count I in favor of Defendants, it does not need to address Defendants' argument that Plaintiffs' claim is barred under the unclean hands doctrine. [69-1] at 13-14.

Defendants to amend the Partnerships' tax returns accordingly.[8] In Count III, Plaintiffs seek to recover damages arising from the same alleged misconduct.

At the heart of the parties' dispute is whether Section 6.8 of each LPA requires indemnification of Defendants "by the Partnerships against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by them (including reasonable attorneys' fees, fines, damages and similar payments) in connection with the Partnership[s]", DSOF ¶ 63, or whether paragraphs 37 and 38 of the Settlement Agreement release the Partnerships from any such obligations. Here, the Prior Litigation was "in connection with" the Partnerships—Defendants' rights to exit under the LPAs and not be forced to sell the Properties. DRPSOF ¶4. On the other hand, Paragraphs 37 and 38 of the Settlement Agreement provide that that nothing is "due from" (i) Defendants to the Partnerships or Plaintiffs, or from (ii) Plaintiffs to the Partnerships or Defendants they say nothing about the Partnerships' obligations to Defendants under the LPAs. Settlement Agmt. ¶¶ 37-38.

The Court declines to address this issue because Defendants are entitled to summary judgment for another reason—Plaintiffs have not suffered any damages as a result of the alleged breach. Plaintiffs do not allege that they actually paid the legal expenses at issue but instead argue that Plaintiff Nationwide incurred additional tax liability due to the indemnification. [39 ¶ 149]. Yet Plaintiffs do not dispute that: (1) Nationwide is not a taxpayer, but passes all of its tax benefits and obligations,

---

[8] In their Amended Complaint, Plaintiffs allege under Count II that they were unable to complete their 2022 tax returns because of Defendants' alleged breach of the Settlement Agreement. [39 ¶ 143]. But Plaintiffs admit that they *were* able timely file their 2022 returns. *See* PRDSOF ¶ 68.

including any additional losses from the Partnerships' indemnification of Defendants, to its investor member, Nationwide Life; (2) Plaintiffs do not know who the ultimate taxpayer associated with Nationwide Life is; (3) Nationwide filed "Form 8082s," such that the indemnification expenses were excluded from Nationwide's tax returns, and thus were not passed on to Nationwide Life, and (4) even if they *had* been passed on to Nationwide Life, there would be no effect on Nationwide's net income. PRDSOF ¶¶66-67, 69, 71. In fact, Nationwide's corporate representative testified that the ultimate taxpayer's tax liability might even be *reduced* as a result of the indemnification. PRDSOF ¶ 71.

Plaintiffs claim it is "well established" that they are not required to establish damages to prevail in a breach of contract claim. [66] at 18. But the only case they cite in support of that proposition applies the law of Wisconsin, not Illinois. *See Hydrite Chemical Co. v. Calumet Lubricants Co.*, 47 F.3d 887, 891 (7th Cir. 1995). The Seventh Circuit has been clear that "[m]erely showing that a contract has been breached without demonstrating actual damage does not suffice, under Illinois law, to state a claim for breach of contract." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007).

Plaintiffs' argument in the alternative that they should be entitled to specific performance fails for similar reasons. Specific performance is an exceptional remedy in a breach of contract claim that "comes into play when damages are an inadequate remedy, whether because of the defendant's lack of solvency or because of difficulty of quantifying the injury to the victim of the breach." *Miller v. LeSea Broad., Inc.*, 87

F.3d 224, 230 (7th Cir. 1996). Here, there is no difficulty in quantifying the injury of the breach; the parties agree there is nothing to quantify. Thus, Defendants are entitled to summary judgment on Counts II and III.

## CONCLUSION

For the reasons explained above, the Court grants Defendants' motion for summary judgment [67, 69] and denies Plaintiffs' motion for summary judgment [62, 65]. Judgment to enter. Civil case terminated.

E N T E R :

Dated: September 30, 2024

_____
MARY M. ROWLAND
United States District Judge

15